```
                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF RHODE ISLAND
_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
     v.                             )     Cr. No. 15-088 S
                                    )
ERIKA TOMASINO,                     )
                                    )
          Defendant.                )
_____ )
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

On September 17, 2015, the Government filed a 45-count Indictment charging Defendant Erika Tomasino ("Defendant" or "Tomasino") and three co-defendants, Juan Vasquez, Belkis Vasquez, and Doris Morel, with Conspiracy to Commit Offenses against the United States, Theft of Government Property, Mail Fraud, Money Laundering, and Aggravated Identity Theft. (See generally Indictment, ECF No. 11.)  Tomasino was implicated in eleven of those counts. (Id.)  Defendants Juan Vasquez and Belkis Vasquez pleaded guilty to their roles in the conspiracy, and Tomasino and Morel (collectively, "Defendants") proceeded to trial.  Over the course of a six-day jury trial, the Government presented the testimony of thirty-three witnesses and hundreds of exhibits.  At the close of the Government's case, the Court denied both Defendants' Rule 29 motions for judgments of acquittal. (9/26/2016 Minute Entry.)

The Court instructed the jury that, if all elements were met beyond a reasonable doubt, it could find Defendants guilty on the substantive counts of the Indictment as a principal, an aider and abettor, or pursuant to Pinkerton v. United States, 328 U.S. 640 (1946).  (See Jury Instructions 23, 34, ECF No. 70.)  To convict under Pinkerton, the Court explained, the jury needed to find beyond a reasonable doubt that:  Tomasino was guilty on the conspiracy count (Count 1); a co-conspirator committed the substantive count charged (here, Aggravated Identity Theft) in furtherance of the conspiracy; Tomasino was a member of the conspiracy at the time the substantive crime was committed; and Tomasino could have reasonably foreseen that one or more of the co-conspirators might commit the charged act.[1]  (Jury Instructions 34-35.)

---

[1] The instruction on Pinkerton liability stated in relevant part:

> There is another method by which you may evaluate whether to find either Defendant guilty of each particular substantive charge in the Indictment.
>
> If, in light of my instructions, you find beyond a reasonable doubt that the particular Defendant was guilty on the conspiracy count (Count One), then you may also, but you are not required to, find her guilty of the substantive crime charged in each of the Counts against that particular Defendant provided you find beyond a reasonable doubt each of the following elements:
>
> First, that someone committed the substantive crime charged in the particular Count;

The case was submitted to the jury and, after deliberations, the jury found Tomasino guilty of Conspiracy to Commit Offenses against the United States (Count 1), Theft of Government Property (Count 2), Mail Fraud (Counts 8-10), Money Laundering (Counts 15, 19, 20, and 24), and Aggravated Identity Theft (Count 39). (Jury Verdict, ECF No. 71.) The jury found Tomasino not guilty on a second count of Aggravated Identity Theft with respect to another alleged victim (Count 40). (Id.; Indictment.) The jury found co-defendant Doris Morel guilty of

---

> Second, that the person you find actually committed the substantive crime was a member of the conspiracy of which you found the particular Defendant was a member;
> Third, that this co-conspirator committed the substantive crime in furtherance of the conspiracy;
> Fourth, that the Defendant was a member of this conspiracy at the time the substantive crime was committed and had not withdrawn from it; and
> Fifth, that the Defendant could reasonably have foreseen that one or more of her co-conspirators might commit the substantive crime.
>
> If you find all five of these elements to exist beyond a reasonable doubt, then you may find the particular Defendant guilty of the substantive crime charged, even though she did not personally participate in the acts constituting the crime or did not have actual knowledge of them.
>
> If, however, you are not satisfied as to the existence of any one of these five elements, then you may not find the particular Defendant guilty of the particular substantive crime unless the Government proves beyond a reasonable doubt that the Defendant personally committed that substantive crime, or aided and abetted its commission.

(Jury Instructions 34-35.)

ten counts of the Indictment, and it acquitted her on a Mail Fraud charge. (Id.)

Before the Court is Defendant Tomasino's Motion for Acquittal asking the Court to acquit her of Count 39 of the Indictment. (See generally Mot. for J. of Acquittal, ECF No. 78.) Count 39 charged Tomasino with, in connection with the Theft of Government Property and Mail Fraud counts, "knowingly transfer[ing], possess[ing], and us[ing], without lawful authority" a "[t]reasury check made payable to J.R.M. in the amount of $9,579.00," by using J.R.M.'s name and Social Security number, on December 27, 2013.[2] (Indictment 22.) The Government opposes the motion. (See generally Gov't's Resp. to Def.'s Mot. for J. of Acquittal, ECF No. 93.) For the reasons set forth below, the Court DENIES Defendant's Motion.

I.   Legal Standard

Rule 29(c)(1) of the Federal Rules of Criminal Procedure states that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." The Court may only grant a Rule 29 motion for judgment of acquittal

---

[2] The Court follows the parties' lead and refers to the victim as "J.R.M." in this Memorandum and Order; however, the victim's full name was used during testimony and appeared on the Government's exhibits, including on the fraudulent tax return and Treasury check associated with this Count. (See Gov't Exs. 229A, 229B, 229C.)

4

"when the evidence and all reasonable inferences to be drawn from the evidence, both taken in the light most favorable to the government, are insufficient for a rational factfinder to conclude that the prosecution has proven, beyond a reasonable doubt, each of the elements of the offense." United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004) (citing United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002)). "Under this formulation, a court considers all the evidence, direct and circumstantial, and resolves all evidentiary conflicts in favor of the verdict." Id. (quoting Moran, 312 F.3d at 487); see also United States v. Valerio, 676 F.3d 237, 244 (1st Cir. 2012).

II. Background[3]

During the six-day trial, the Government put on evidence from which a reasonable jury could deduce the following, beyond a reasonable doubt. From at least January 2010 through November 2014, Juan Vasquez operated the Dominican Market, a grocery store in Pawtucket, Rhode Island, which served as the hub for the conspiracy at issue. (Trial Tr. 5:11, 23:2-10, Sept. 22-23, 2016, ECF No. 83 (hereinafter "Sept. 22-23, 2016 Trial Tr.").) During this time, the charged Defendants, as well as unindicted co-conspirators, operated a scheme out of the Dominican Market

---

[3] In the interest of brevity, the Court only recounts the facts necessary to resolve this Motion; the evidence at trial revealed a more complicated conspiracy that involved many more people, bank accounts, and entities than the Court recites here.

to cash fraudulently-obtained and stolen Treasury checks. (Sept. 22-23, 2016 Trial Tr. (Agent Amsden).) The Treasury checks exceeded $2.6 million in value and were deposited into at least 21 bank accounts held or controlled by co-conspirators. (See Gov't Exs. 177A, 177B.) Some of the Treasury checks were obtained by filing fraudulent tax returns bearing the names and Social Security numbers of real people. (See Sept. 21, 2016 Trial Tr.) Many of these people were residents of Puerto Rico; this was key to the conspiracy because residents of Puerto Rico, the jury learned, are not required to file tax returns unless they earned income in the continental United States for that tax year. (Sept. 19, 2016 Trial Tr. 7:24-25, 8:1-3, ECF No. 79.) Co-conspirators stole other Treasury checks from the U.S. mail. (Sept. 22-23, 2016 Trial Tr. 21, 24.) At least three fraudulent tax refunds were sent to Tomasino's residence and deposited into the accounts of co-conspirators. (Id. at 24:5-10; Sept. 19, 2016 Trial Tr. 23-26; Gov't Ex. 181.)

Juan Vasquez employed Defendant Tomasino, as well as co-Defendant Morel, at the Dominican Market for over ten years. (Sept. 22-23, 2016 Trial Tr. 11:20-12:4, 18:3-22.) Tomasino was Vasquez's secretary and bookkeeper, and she also cashed checks at the Dominican Market. (Id. at 18:7-10; 21:3-7.) Tomasino was a bookkeeper for a second business, RI Produce, and was a co-signor on its bank account. (Id. at 18:14-24.) Co-

6

conspirators deposited fraudulently-obtained Treasury checks into accounts belonging to the Dominican Market and RI Produce, along with legitimate payroll checks, in order to cloak the fraudulently-obtained checks from detection. (Id. at 21:3; Trial Tr. Sept. 23, 2016 (Agent Amsden).) Tomasino also told federal agents, before she was indicted, that the market received faxes with personal identifying information, which she would roll up and drop through a hole connecting the market to its basement office. (See Sept. 22-23, 2016 Trial Tr. 26:10-21.)

Nestor Guerrero, an employee of the Dominican Market, testified that he could not speak, read, or write in English and that Tomasino had assisted him in opening bank accounts that were controlled by Juan Vasquez and Tomasino. (Sept. 22, 2016 Trial Tr. (Nestor Guerrero).) He also stated that, while the Dominican Market did have a check cashing operation for customers, it did not cash Treasury checks because they required additional verification of the individual's identity. (Id.) He stated that he never saw anyone at the Dominican Market cash a Treasury check for a customer. (Id.)

Harold Sanabria testified that he was Vasquez's friend. (Sept. 21, 2016 Trial Tr. (Harold Sanabria).) Sanbria spent time at the Dominican Market chatting with employees and doing errands for the market. (Id.) He testified that he was disabled and had acute depression. (Id.) He further stated

7

that Tomasino drove him to the bank and waited outside while he deposited checks at Tomasino's direction. (Id.)

A fraudulent tax return was filed in J.R.M.'s name for tax year 2012, in November 2013. (See Gov't Ex. 229B.) A corresponding refund check issued in December 2013. (See Gov't Ex. 229A.) Tomasino deposited the fraudulently-obtained refund check into the checking account of RI Produce at Citizens Bank. (Id.) As noted above, Tomasino and Juan Vasquez controlled the RI Produce checking account.

At trial, Evelyn Buckley, Investigative Analyst for the Criminal Investigation Division of the Internal Revenue Service ("IRS") testified about the IRS's tax return validation processes and, specifically, about the tax return and W-2 filed with the IRS on behalf of J.R.M. for the 2012 tax year. (See Sept. 19, 2016 Trial Tr. 3-17.) Buckley testified that, once a tax return is filed with the IRS, the IRS verifies the return by entering the first four letters of the person's last name and matching it in its system to "make sure it is an accurate and valid Social Security number." (Id. at 6:18-25.) The Social Security number on the tax return is further cross-referenced with the Social Security Administration. (Id. at 7:1-7.) She explained that the IRS will not accept a tax return with a fake Social Security number on it and that the IRS will only accept one tax return per Social Security number each tax year. (Id.

8

at 7:17-23.)

Buckley also reviewed with the jury J.R.M.'s 2012 tax return, refund check, and the IRS's Information Returns Processing record for J.R.M.'s 2012 tax year. (See id. at 13-17; Gov't Exs. 229A-C.) She identified Government Exhibit 229B as the tax return of "J.R.M." from tax year 2012 and Government Exhibit 229A as the corresponding Treasury refund check, dated December 2, 2013. (Sept. 19, 2016 Trial Tr. 13:3-7, 15:6-8.) The back of the Treasury check was endorsed with a signature (which clearly spelled out J.R.M.'s full name) and a stamp reading: "FOR DEPOSIT ONLY, RI PRODUCE, INC, CITIZENS BANK RI" followed by a bank account number. (Id. at 16:1-2.) Buckley also reviewed the IRS's Information Returns Processing system record for J.R.M.'s 2012 income tax. (Id. at 16-17; Gov't Ex. 229C.) Of note, an employer had reported wages for J.R.M. to the IRS, but the name of the employer reporting wages and the amount of wages did not correspond with the employer and wages earned reflected on J.R.M.'s 2012 tax return. (Sept. 19, 2016 Trial Tr. 16-17; Gov't Ex. 229C.)

In addition to the evidence discussed above, other evidence was submitted to the jury implicating Defendant Tomasino, including but not limited to:  surveillance photographs of Tomasino depositing fraudulent checks at the bank (see, e.g., Gov't Exs. 23C, 24C); the testimony of a dozen victims

9

indicating that they had no knowledge that tax returns bearing their names and Social Security numbers had been filed, nor did they have knowledge of or ever receive the corresponding Treasury checks that were ultimately deposited into accounts controlled by the co-conspirators; additional tax records; additional bank records; and federal agents' testimony describing their investigation and Tomasino's self-serving statements to them (see, e.g., Sept. 22-23, 2016 Trial Tr. 3-136).  There was also evidence that Tomasino collected fraudulently-obtained Treasury checks from her home mailbox and deposited those checks into accounts controlled by the co-conspirators, and that she withdrew proceeds from the scheme. (See, e.g., Sept. 23, 2016 Trial Tr. 129-32, 140.)

   III. Discussion

   The federal Aggravated Identity Theft statute, 18 U.S.C. § 1028A(a)(1), makes it a crime to "knowingly transfer[], possess[], or use[], without lawful authority, a means of identification of another person" during and in relation to the commission of certain felonies, enumerated in 18 U.S.C. § 1028A(c), including Mail Fraud and Theft of Government Property. To support a conviction under § 1028A(a)(1), the Government must prove beyond a reasonable doubt that "the defendant knew that the means of identification at issue belonged to another person." Flores-Figueroa v. United States, 556 U.S. 646, 657

(2009). Indeed, the Government must prove that a means of identification belonged to a real person. Valerio, 676 F.3d at 242 (citing Flores-Figueroa, 556 U.S. at 646). The First Circuit has acknowledged that whether a person knew that the means of identification belonged to a real person "may be proven by circumstantial evidence alone; indeed, it frequently cannot be proven in any other way." Valerio, 676 F.3d at 244 (quoting United States v. Agosto-Vega, 617 F.3d 541, 549 (1st Cir. 2010)).

In her Motion, Tomasino argues that the Government failed to prove that Tomasino used J.R.M.'s means of identification; that J.R.M is a real person; and that Tomasino knew that J.R.M. is a real person. (Mot. for J. of Acquittal 4.)

First, Tomasino argues that the Government failed to prove that she used J.R.M.'s means of identification. (Id.) More specifically, Defendant argues that depositing a check does not constitute the use of a means of identification. Defendant argues that, "[i]n this case a person came to the Dominican Market with the check, held themselves out to be J.R.M., endorsed the check over to Ms. Tomasino who then cashed it and later deposited it into her account." (Id.) She further contends that "the government produced no evidence at trial regarding how Ms. Tomasino came into possession of this endorsed check." (Id.) Without evidence that Tomasino used J.R.M.'s

11

means of identification, Tomasino avers that the Government did not prove the element beyond a reasonable doubt.

Defendant's argument gets no traction. As stated, the Court must view the evidence, direct and circumstantial, in the light most favorable to the jury's verdict. Pimentel, 380 F.3d at 584. As a factual matter, the evidence supports a reasonable inference that Tomasino and/or co-conspirators endorsed and deposited the Treasury refund check made out to J.R.M. As a legal matter, these acts constitute the use of a means of identification. Courts have routinely upheld convictions for Aggravated Identity Theft where defendants have deposited checks bearing forged signatures. See United States v. Blixt, 548 F.3d 882, 888 (9th Cir. 2008) ("[F]orging another's signature constitutes the use of that person's name for the purpose of applying the Aggravated Identity Theft statute."); see also United States v. Lewis, 443 F. App'x 493, 496 (11th Cir. 2011) ("As the signature of an individual's name specifically identifies that individual, we conclude that forging another's signature constitutes the use of a 'means of identification.'"); United States v. Wilson, 788 F.3d 1298, 1310 (11th Cir. 2015) ("We find the plain language of 18 U.S.C. § 1028A resolves th[e] issue and hold that the use of a person's name and forged signature sufficiently identifies a specific individual to qualify as a 'means of identification' under the aggravated

12

identity theft statute."); cf. United States v. Gonzalez-Martinez, 825 F.3d 51, 56-57 (1st Cir. 2016) (upholding an aggravated identity theft conviction where the defendant cashed forged checks, though the issue of whether that was sufficient to constitute the "use" of a "means of identification" was not squarely before the court).

Second, Tomasino argues that the Government did not prove beyond a reasonable doubt that J.R.M. is a real person. (Mot. for J. of Acquittal 4.)  Again, the circumstantial evidence presented at trial supports the jury's conclusion that J.R.M. is a real person.

The evidence demonstrated that the IRS validates names and Social Security numbers appearing on income tax returns against both its own system and that of the Social Security Administration.  Buckley's testimony indicated that the IRS would not have issued a Treasury check if the identity on the tax return had not been validated.  See United States v. Philidor, 717 F.3d 883, 885–86 (11th Cir. 2013) (concluding that the district court had not clearly erred in drawing the inference that, because the IRS "issued refunds for tax returns listing [certain Social Security] numbers, . . . the Social Security numbers corresponded to actual persons").  Moreover, the jury heard the testimony of over a dozen victims of the scheme, from which a jury could reasonably infer that the scheme

13

involved obtaining the identities of real people. Indeed, the evidence showed that Tomasino herself received faxes containing lists of personal identifying information and passed them along to Juan Vasquez. Accordingly, taking all the evidence and reasonable inferences drawn therefrom in the light most favorable to the verdict, the jury could have reasonably concluded that this element was proven beyond a reasonable doubt. See Pimental, 380 F.3d at 584.

Third, Tomasino argues that the Government did not prove that she knew J.R.M. was a real person. (Mot. for Judgment of Acquittal 5.) Defendant argues that an inference cannot be reasonably drawn from the evidence at trial that J.R.M. was a real person known to Tomasino. The Court disagrees. Over a number of years, Tomasino and her co-conspirators executed a scheme in which the names and Social Security numbers of real people were repeatedly submitted to the IRS for validation. That they were confident enough in the names and Social Security numbers they used, including those belonging to J.R.M., to repeatedly subject them to government scrutiny supports a reasonable inference that the co-conspirators knew they belonged to real people. See Valerio, 676 F.3d at 245 (stating that a "'willingness to subject [a] social security card repeatedly to government scrutiny' is evidence that allows a reasonable jury to find that a defendant knew that a stolen identity belonged to

14

a real person" (quoting United States v. Holmes, 595 F.3d 1255, 1258 (11th Cir. 2010), and citing United States v. Gómez-Castro, 605 F.3d 1245, 1249 (11th Cir. 2010))); see also United States v. Little, 552 F. App'x 937, 940 (11th Cir. 2014) (holding that there was sufficient evidence to support a conviction for Aggravated Identify Theft under 18 U.S.C. § 1028A(a)(1) because "[t]he fact that the checks were tax refunds issued by the United States Treasury, which ordinarily would not be issued to fictitious people, creates a reasonable inference that [the defendant] knew the payees of the checks were real" (footnote and citation omitted)).[4]

---

[4] In United States v. Gonzalez, 560 F. App'x 554 (6th Cir. 2014), the Sixth Circuit reversed a conviction in a case bearing some similarities to the instant matter. Gonzalez is, however, distinguishable. There, the defendant fraudulently used a doctor's national provider identification number (NPI) to submit false insurance claims. An NPI is a unique identifier issued by the Centers for Medicare and Medicaid Services to healthcare providers. Id. at 556. The evidence at trial showed that the defendant received the doctor's name and NPI in a text message. Id. The Sixth Circuit concluded that there was insufficient evidence to support a finding that Gonzalez knew it was a real person's NPI because the Government did not provide evidence that the IRS validates doctors' NPIs regularly and there was no proof that Gonzalez was aware of any such validating procedures for the NPIs for organizations. Id. at 560. The Sixth Circuit concluded that Gonzalez could have thought that "a fraudster could obtain an NPI number, at least for a while, for a doctor who is fictitious." Id. The court distinguished the case from others on the grounds that the defendant did not have additional identity documents like birth certificates or credit reports, see United States v. Valerio, 676 F.3d 237, 245 (1st Cir. 2012); nor had the defendant repeatedly and successfully tested the authenticity of the identifying information prior to the charged crime, see United States v. Doe, 661 F.3d 550, 562-63 (11th Cir.

Although there was likely insufficient evidence to prove beyond a reasonable doubt that Tomasino and her co-conspirators knew J.R.M. personally, the Government did not have that burden. Drawing all evidentiary inferences in favor of the verdict, the Court must conclude that there was evidence beyond a reasonable doubt that Tomasino and/or her co-conspirators knew that J.R.M. was a real person.

IV.  Conclusion

For the foregoing reasons, the Court DENIES Defendant's Motion for Acquittal (ECF No. 78).

IT IS SO ORDERED.

_/s/ William E. Smith_
William E. Smith
Chief Judge
Date:   February 27, 2017

---

2011), thus providing circumstantial evidence that the defendant knew the identifying information belonged to real people.  Id. at 561.  The instant case is distinguishable because, here, the co-conspirators repeatedly tested the taxpayers' personal identification information by submitting tax returns bearing their names and Social Security numbers.  This is sufficient to create a reasonable inference that they were confident in the information's validity.